IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FMC CORP., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AMVAC CHEMICAL CORP., | : | |
| Defendant. | : | 05-cv-2593 |

M E M O R A N D U M  A N D  O R D E R

AUGUST 1, 2005

PRATTER, DISTRICT JUDGE

I.     BACKGROUND

The instant procedural dispute between FMC Corporation ("FMC"), a pioneer pesticide

producer, and AMVAC Chemical Corporation ("AMVAC"), a generic pesticide producer,

centers on the equitable application of the so-called "first-filed" or "first-to-file" rule.

AMVAC is a California corporation headquartered in Orange County, California.

AMVAC paid $2.7 million to FMC for the right to use FMC's scientific data studies in

connection with AMVAC's submission of registrations to both the Environmental Protection

Agency ("EPA") and the California Department of Pesticide Registration ("CDPR") for

bifenthrin-based pesticide products.  AMVAC manufactures and distributes the products

Wisdom TC and Discipline 2 EC, which are the functional equivalents of FMC's TalstarOne and

Capture 2 EC, respectively.[1]

Additional pertinent facts and procedural history follow.

On March 4, 2005, FMC notified AMVAC of its belief that AMVAC's product labels for Wisdom TC and Discipline 2 EC are virtually identical to the product labels for FMC's TalstarOne and Capture 2 EC, respectively, and thus AMVAC's product labels are infringing the copyrights to FMC's product labels. Immediately following the March 4 letter, the parties commenced preliminary settlement negotiations. By letter dated April 20, 2005, AMVAC informed FMC that it wished to settle the matter amicably and solicited further negotiations. Subsequently, on or about May 23, 2005, AMVAC informed FMC that it was willing to work with FMC on changing its (AMVAC's) labels, provided that, during the regulatory label approval process, FMC would permit AMVAC to continue its sales of bifenthrin-based products with the current labels until the revised labels were approved by the EPA. See E-mail from Milton Steele to Eric Wintemute, dated May 24, 2005 (Ex. 19 to AMVAC Reply Br.). FMC refused, as a term of settlement, to permit or condone continued sales of AMVAC products with allegedly infringing labels. Id.

While AMVAC and FMC were engaged in negotiations, on May 16, 2005, this Court filed a Memorandum and Order in FMC Corp. v. Control Solutions, Inc., 369 F.Supp.2d 539 (hereinafter, "Control Solutions" or "CSI Op. at __"), a case with similar, but not identical, causes of action, affirmative defenses and counterclaims, as many of those involved here.[2]

---

[1] FMC possesses presumptively valid copyright registrations in both the Capture 2 EC label and the TalstarOne label. See FMC Memorandum of Law, Exhibits D, E, and G (the "FMC Registrations").

[2] The facts of the instant matter are distinguishable from Control Solutions, inasmuch as that matter did not involve a data compensation agreement, pursuant to which substantial consideration allegedly was exchanged for the use of a pioneer product's scientific data studies to be submitted to the EPA. This type of mechanism for pesticide

Apparently buoyed by <u>Control Solutions</u>, on May 20, 2005, FMC sent a cease-and-desist letter to AMVAC demanding that AMVAC stop using the two labels that FMC alleges that AMVAC copied from FMC.  The letter stated in pertinent part:

> Now that the legal issues AMVAC has raised have been decided in an extensive and well reasoned opinion, FMC is giving AMVAC *one last opportunity* to resolve this matter short of litigation.  FMC is willing to resolve the matter on the following terms: (1) AMVAC must immediately enter into an agreement consistent with the [<u>Control Solutions</u>] preliminary injunction order and (2) AMVAC must agree to negotiate a reasonable royalty due to its past infringement.

Letter from Abbe F. Fletman (FMC counsel) to Arthur Rose (AMVAC counsel), dated May 20, 2005 (emphasis added).  Within the cease-and-desist letter, FMC demanded that AMVAC respond to its letter within five (5) business days or face a lawsuit.  The five-business-day deadline was to expire on **Friday, May 27, 2005**.  Nonetheless, before the expiration of this five day period, during which period the record discloses that the parties appeared to be negotiating in good faith, on **Thursday, May 26, 2005**, AMVAC had actually filed a lawsuit against FMC in the Central District of California seeking declaratory relief (the "California Action")[3] with regard to AMVAC's interpretation of the data compensation agreement (the "DCA") previously entered into by FMC and AMVAC.[4]  AMVAC contends that the DCA authorizes it to sell generic,

---

approval is discussed below, as are data compensation agreements, generally, and the specific one at issue in the instant matter.

    [3] Central District of California, Civil Action No. SACV 05-511 AHS.

    [4] The DCA underlying the California Action forms the basis of several of AMVAC's claims and defenses in that case and in the dispute here, including its breach of contract claim.  Nowhere in the DCA, however, is there explicit permission for AMVAC to copy FMC's product labels.  Section 5.01 of the DCA specifically provides that $2.7 million is being paid by AMVAC to FMC "*for the rights to the Studies. . .*"  Additionally, the DCA contains both mandatory arbitration and Delaware choice-of-law clauses.  DCA, ¶ 7.09 ("The validity, interpretation, and performance of this Agreement shall be governed by the substantive laws of the State of Delaware, without reference to the conflicts of laws provisions thereof . . . . *[A]ny dispute . . . shall be resolved through binding arbitration* administered by the American Arbitration Association, or such other provider of alternative dispute resolution

derivative bifenthrin-based pesticides utilizing label language that is nearly identical to the labels FMC attaches to its own bifenthrin products.

Before FMC's counsel learned of the California Action,[5] FMC, on June 1, 2005, having waited until after the forbearance date of May 27, filed the instant action against AMVAC in the Eastern District of Pennsylvania (the "Pennsylvania Action").  (Docket No. 1).[6]  The Philadelphia Action was assigned to this Court because FMC indicated to the Clerk of Court that the instant matter is related to the Control Solutions case.[7]

Although, as a result of FMC's May 20, 2005 letter, it appears that the parties had re-engaged in robust negotiations, AMVAC now contends that it believed that the parties had terminated negotiations prior to FMC's 5-day deadline.  However, no such explicit, documented

_____

services as both Parties may agree. *Such arbitration shall be held in Washington, D.C. . . .* ") (emphasis added).

   [5]  As discussed more fully below, the following statement by AMVAC may be described as disingenuous: "AMVAC served FMC [with the California Action] on May 27, 2005."  In fact, despite the fact that AMVAC had been negotiating exclusively with FMC's lawyers from the Wolf Block firm in Philadelphia, *Pennsylvaina*, AMVAC instead served the California Action papers on FMC's corporate designee, *in Delaware*.  AMVAC did not contemporaneously send courtesy copies of the California Action papers to FMC's counsel.  Wolf Block only learned of the California Action after receiving an e-mail dated Wednesday, June 1, 2005, six (6) days after the California Action was filed and only after Wolf Block had first provided courtesy notice to AMVAC that FMC, on that same day (June 1), had filed a lawsuit in Philadelphia.  In fact, the recipient of the June 1 e-mail, because the message arrived at 9:52 p.m. on June 1, did not receive it until June 2, 2005, *a full week* after AMVAC filed the California Action.  See Bunting Decl., Supp. Br. of FMC in Opp. to AMVAC Motion, ¶6.

   [6] FMC subsequently filed an Amended Complaint on June 7, 2005.  (Docket No. 2).

   [7] In Control Solutions, this Court found, *inter alia*, that (1) pursuant to EPA regulations, pesticide products cannot be sold or distributed without their regulatory-approved labels and (2) that the labels are certainly of no use or value absent the product for which they have been created.  Such a relationship is ironically similar to the symbiotic relationship existing between a termite and the protozoan needed to digest the fibers the termite has ingested:

> Termites cannot themselves digest the wood that they consume. Instead they rely upon symbiotic protozoans (metamonads) in their intestines to digest the cellulose for them, absorbing the end products for their own use.  These protozoans in turn rely on symbiotic bacteria to produce the necessary enzymes.  This relationship is one of the finest examples of mutualism among animals.

http://www.absoluteastronomy.com/encyclopedia/t/te/termite.htm (last visited, July 25, 2005).

termination communications are contained within the record before this Court. Nevertheless, on Thursday, May 26, 2005, one day before the unofficial start of Memorial Day holiday weekend, AMVAC filed the California Action seeking a judicial declaration that AMVAC was not infringing FMC's copyright on the applicable product labels.[8]  Curiously, rather than serve the FMC's lawyers in Pennsylvania from the firm Wolf, Block, Schorr and Solis-Cohen ("Wolf Block") with whom AMVAC and its counsel had been negotiating directly for some time, on **Friday, May 27, 2005**, late in the afternoon before the long Memorial Day weekend*, AMVAC served **FMC's registered agent, in Delaware**.  FMC and Wolf Block did not learn of the California Action until at least **Wednesday, June 1, 2005,** at approximately 10:00 p.m., Eastern Daylight Time, the middle of the following week, and only after Wolf Block, still unaware of the California Action, had advised and sent AMVAC's counsel a copy of the Pennsylvania Action that had been filed *earlier on June 1* with this Court.  The e-mail, dated **Wednesday, June 1, 2005 at 9:52 p.m.**, from AMVAC's counsel to FMC's Philadelphia-based counsel responding to the Wolf Block courtesy notice, highlights a certain problematic professional one-upmanship:

> Thank you for sending us a copy of the complaint you filed on behalf of FMC **today** [June 1, 2005].  I am wondering if you could also send us a copy of the exhibits attached to the complaint.  A copy of the complaint **we filed on [May 26, 2005]** is attached.  Thank you.

E-mail from Art Rose to Abbe Fletman, June 1, 2005, **9:52 PM (EDT)** (subject:  FMC's Complaint) (emphasis added) (hereinafter, the "Rose E-mail").  AMVAC has not refuted the fact that it did not previously or otherwise inform FMC's Philadelphia counsel at Wolf Block of the

---

[8] AMVAC contends that it initiated the California Action on May 26, 2005, because AMVAC believes it needed to "confirm its rights under the $2.7 million agreement and to prevent FMC from disparaging AMVAC in the marketplace."

California Action.

On June 9, 2005, AMVAC filed the instant Motion and Brief in Support to Dismiss or Stay, or, in the Alternative, to Transfer the Pennsylvania Action to the Central District of California (the "AMVAC Motion").[9]  (Docket No. 4).  The next day, on June 10, 2005, FMC filed a Motion Preliminary Injunction as a corollary to the Pennsylvania Action.  (Docket No. 9).  On June 20, 2005, FMC filed its Response in Opposition to the AMVAC Motion (the "FMC Response").  (Docket No. 12).  AMVAC filed its Reply to FMC's Response on June 27, 2005 (the "AMVAC Reply").  Thereafter, the Court held oral argument on June 29, 2005 (hereinafter "Tr. at __") and invited the parties to provide supplemental post-argument submissions.  AMVAC filed a Post-Hearing Memorandum in Support of its Motion on July 5, 2005 (the "AMVAC Support") (Docket No. 18).  FMC filed its Supplemental Memorandum in Opposition on July 5, 2005 (the "FMC Supp. Opp.") (Docket No. 20).

For the reasons stated more fully below, based on a full review of the record thus far established and the controlling law with regard to the first-to-file rule, the Court finds that pursuant to the guidance provided by our court of appeals, FMC has made a credible showing that AMVAC engaged in behavior that establishes each of the exceptions allowing a district court to refuse to adhere to a wooden interpretation and application of the first-to-file rule, namely, inequitable conduct, bad faith, anticipatory filing, forum shopping and/or forum avoidance.[10]   Therefore, the Court denies the AMVAC Motion and retains jurisdiction of the

---

[9] AMVAC filed a corrected brief in support on June 14, 2005.  (Docket No. 10).

[10]  The Court chooses to assume that, going forward, the parties (and their counsel) will assiduously avoid any other examples of the sharp "gotcha" practices (or similar conduct) that form the basis for the Court's decision here.

instant matter.

II.    STANDARD OF REVIEW--THE FIRST-TO-FILE RULE

The first-to-file rule is used to dismiss or stay a later-filed action.  Traditionally, where there are parallel proceedings in different federal courts, the first court in which jurisdiction attaches has priority to consider the case.  "'In all cases of [federal] concurrent jurisdiction, the court which first has possession of the subject must decide it.'"  Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir. 1941), cert. denied, 315 U.S. 813 (1942), quoting Smith v. McIver, 22 U.S. 532, 535 (1824). "The party who first brings a controversy into a court of competent jurisdiction for adjudication should, so far as our dual system permits, be free from the vexation of subsequent litigation over the same subject matter." Id. at 930.

The United States Supreme Court, the Court of Appeals for the Third Circuit, and the Court of Appeals for the Ninth Circuit have each recognized and followed the first-to-file rule where there are two competing district court actions.  See Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180 (1952) (affirming a Third Circuit Court of Appeals decision to stay second-filed action in favor of earlier-filed action); Crosley Corp. v. Westinghouse Elec. & Mfg. Co., 130 F.2d 474, 475 (3d Cir.), cert. denied, 317 U.S. 681 (1942) (reversing district court decision not to enjoin second-filed suit; Hazeltine, 122 F.2d at 930-31 (ordering district court to enjoin second-filed patent infringement action in favor of first-filed declaratory judgment action); Triangle Conduit & Cable Co. v. Nat'l Elec. Prods. Corp., 125 F.2d 1008 (3d Cir.), cert. denied, 316 U.S. 676 (1942) (reversing district court decision not to enjoin second-filed suit); Alltrade, Inc. v. Uniweld Products, Inc., 946 F.2d 622 (affirming applicability of first-to-file rule and

staying second-filed action); <u>Decker Coal Co. v. Commonwealth Edison Co.</u>, 805 F.2d 834 (9th

Cir. 1986) (affirming decision to stay second filed action).

Nevertheless, the Court of Appeals for the Third Circuit has articulated and applied

exceptions to the traditional first-to-file rule.  The first-to-file rule and its equitable exceptions

are discussed most particularly in <u>Equal Employment Opportunity Commission v. University of</u>

<u>Pennsylvania</u>, 850 F.2d 969 (3d Cir. 1988), <u>aff'd on other grounds</u>, 493 U.S. 182 (1990)

(hereinafter "<u>EEOC</u>").

> The first-filed rule encourages sound judicial administration and promotes
> comity among federal courts of equal rank.  It gives a court "the power" to
> enjoin the subsequent prosecution of proceedings involving the same parties
> and the same issues already before another district court.

<u>EEOC</u>, 850 F.2d at 971-72 (citing <u>Triangle</u>, 125 F.2d at 1009); <u>see also</u>, <u>Polaroid Corp. v.</u>

<u>Casselman</u>, 213 F.Supp. 379, 381 (S.D.N.Y. 1962) ("weight is given not to inconsequential

priority in filing time but to substantial commitment to the cause, usually pre-trial involvement

for many months, by the court first acquiring jurisdiction").  Nevertheless, the first-to-file rule "is

not a mandate directing wooden application of the rule without regard to rare or extraordinary

circumstances, **inequitable conduct, bad faith, [anticipatory filing]** *or* **forum shopping**."

<u>EEOC</u>, 850 F.2d at 972 (emphasis added); <u>cf.</u> <u>Tempco Electric Heater Corp. v. Omega</u>

<u>Engineering, Inc.</u>, 819 F.2d 746, 749-50, (7th Cir. 1987) (holding that the party filing first does

not necessarily have a "right" to choose the forum, since the whole purpose of a declaratory

judgment action would be "aborted by its use as an instrument of procedural fencing either to

secure delay or to choose a forum.").

III.    FIFRA[11] AND DATA COMPENSATION AGREEMENTS

Pursuant to the Federal Insecticide Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C.

§§ 136, et seq., the application for a pesticide registration must include a complete copy of the

proposed label for the product.  See 7 U.S.C. § 136a(c)(1)(C).  The products and labels at issue

here are pesticides that contain bifenthrin as their active ingredient.  Following the expiration of

FMC's bifenthrin patent, AMVAC applied to the EPA for a registration of its own generic

bifenthrin-based products.  AMVAC's bifenthrin applications are "follow-on" or "me-too"

applications because they seek to register a product that had been previously registered by FMC.

(Wintemute Decl. ¶ 11.)

The "me-too" procedure of FIFRA requires identical or substantially similar labels.[12]

FIFRA permits the submission of a "follow-on" or "me-too" application for a pesticide product

that is "identical or substantially similar in composition and labeling to a currently-registered

pesticide." 7 U.S.C. § 136a(c)(3)(B)(i)(I).  The EPA is required to complete an expedited review

of these applications.  See 7 U.S.C. §136a(c)(3)(B)(ii)(II) (requiring EPA to complete "me-too"

review within 90 days).  AMVAC contends that the "me-too" registration procedure encourages

competition by providing an expedited method for subsequent applicants to register products that

are identical or substantially similar in composition and labeling to those that have already

---

[11] For an additional lengthy discussion of FIFRA, see this Court's Control Solutions Memorandum, supra, 369 F.Supp.2d at 543.

[12] The Court has found no support for the proposition that the EPA, through FIFRA or another regulation, permits or requires a "me-too" applicant to copy a competitor's label without permission or other authority.  See Control Solutions, 369 F.Supp.2d at 568-71.  Cf. SmithKline Beecham Consumer Healthcare, LP. v. Watson Pharmaceuticals, Inc., 211 F.3d 21, 22 (2d Cir. 2000).

received EPA approval.  <u>See</u> Swaroop Decl., Ex. 10 at *31 (explaining that the "me-too"

procedure "is generally intended to hasten registration decisions on end-use pesticides that are

identical or substantially similar to a currently registered pesticide…").

FIFRA contains data compensation provisions that authorize "me-too" applicants to rely

upon data submitted by the original registrant, if the "me-too" applicants offer to pay for that

data.  <u>See</u> 40 C.F.R. § 152.86; <u>see also</u>, <u>Ruckelshaus v. Monsanto Co.</u>, 467 U.S. 986, 1014-15

(discussing governmental takings pursuant to the Fifth Amendment to the Constitution and,

adopting similar reasoning, recognizing that pursuant to FIFRA, the EPA may consider the data

and trade secrets submitted by a prior pesticide applicant in evaluating a subsequent application,

so long as the subsequent applicant paid just compensation for the data, inasmuch as such a

policy spares subsequent applicants the cost of time-consuming research and eliminates

significant barriers to entry in the pesticide market, thereby enhancing competition); <u>Kelo v. City</u>

<u>of New London</u>, 125 S.Ct. 2655, 2664-66, 2005 WL 1469529 at * 7, * 8 (June 23, 2005)

(discussing the Supreme Court's prior holding in <u>Ruckelshaus</u> and noting that, subsequent to

<u>Ruckelshaus</u>, the Court "recognized that the 'most direct beneficiaries' of the data-sharing

provisions were the subsequent pesticide applicants, but benefitting them in this way was

necessary to promoting competition in the pesticide market.") (citation and footnote omitted).

Thus, a "me-too" applicant such as AMVAC must pay data compensation to the original

registrant, in this case, FMC.

In 2003, AMVAC initiated data compensation discussions with FMC.  (Wintemute Decl.

¶13).  For approximately one year, AMVAC negotiated the DCA with FMC and subsequently

paid $2.7 million to FMC in exchange for the right to rely upon FMC's bifenthrin study data for

its own product registrations.  See (Wintemute Decl., Ex. 2).  AMVAC and FMC exchanged

numerous communications and conducted an in-person meeting in Orange County, California to

negotiate the DCA.  During DCA negotiations, FMC accepted AMVAC's "unqualified 'cite-all'

offers in accordance with 40 C.F.R. § 152.86."  (Swaroop Decl., Ex. 7) ("[w]e understand your

offers to be unqualified 'cite-all' offers in accordance with 40 C.F.R. § 152.86, and FMC accepts

them subject to the agreement upon or award of an appropriate amount").  A "cite-all" offer is an

offer for data compensation that includes all of the data relied upon in the original FIFRA

registration.  See 40 C.F.R. § 152.86.[13]  AMVAC alleges that the DCA at issue here granted

AMVAC the right to rely upon FMC's bifenthrin labels to obtain or to support any federal or

state bifenthrin registration.  See Wintemute Decl., Ex. 2 at 6-7.  Thus, AMVAC believes that,

pursuant to its interpretation of the DCA, it was entitled to rely upon not only FMC's data, but

also those FMC's labels that were previously submitted by FMC as part of its original bifenthrin

registrations.

The DCA also included a letter of authorization from FMC to the California Department

of Pesticide Regulation (the "CDPR"), in which FMC authorized AMVAC's bifenthrin

registrations in California based on AMVAC's EPA registrations.  See Wintemute Decl., Ex. 3.

As part of the CDPR authorization, FMC expressly authorized the use of its data for "any

AMVAC application to obtain California registrations for pesticide products registered by the

[EPA] under the following [EPA] registration numbers: 5481-505, 5481-518, 5481-519, 5481-

520, 5481-517."  See id.  In December 2003, at FMC's request, AMVAC provided copies of its

_____

[13] AMVAC argues in this litigation for an interpretation of the DCA by which "data" means the same thing
as "all of the language, including all of the scientific data studies, contained in FMC's related product labels."  This
issue will, of course, be an important feature of this case.

proposed product labels to FMC.  FMC Amended Complaint at ¶ 38.[14]  In October 2004 and

again in February 2005, FMC wrote letters to the CDPR on AMVAC's behalf.  (Wintemute

Decl., Exs. 3, 4).  FMC's entitlement to a portion of AMVAC's $2.7 million payment was tied to

the ultimate CDPR approval of AMVAC's bifenthrin products.  (Wintemute Decl., Ex. 2 at 9.)[15]


## IV.  DISCUSSION


### A.       The Parties' Primary Positions

AMVAC alleges that the instant case presents a straightforward application of the first-to-

file rule.  The Court is less sanguine.  Inasmuch as AMVAC initiated litigation by filing the

California Action, on the facts presented and the relevant record established thus far, including

declarations by the parties (with regard to letter and e-mail correspondence between the parties

and their lawyers depicting settlement discussions from March 2005 to June 2005), it appears

that this is a more difficult matter of addressing and balancing the first-to-file rule against

allegations of anticipatory filing, inequitable conduct, bad faith, forum shopping and forum

avoidance.  See EEOC, supra, 850 F.2d at 972.

---

[14] In early 2005, FMC applied for copyright registrations for the product labels at issue here.  Thereafter, in March 2005, FMC accused AMVAC of copyright infringement.  FMC Amended Complaint at ¶ 43.

[15] Additionally, as part of the DCA, FMC released AMVAC from "any and all claims for data compensation under FIFRA, or any successor statute, arising from AMVAC's offers to pay compensation for its reliance on the Studies in order to obtain registrations contemplated under this Agreement, and any present and future end-use registrations for products formulated from AMVAC's Bifenthrin Technical Registration product by AMVAC or its Customers."  Id. at 8.

-12-

**B.      AMVAC Filed the California Action Despite Ongoing Negotiations with Pennsylvania Counsel**

AMVAC filed the California Action on May 26, 2005, requesting a judicial declaration that it is authorized under the DCA to sell its products with the allegedly infringing labels.  FMC first learned of the California Action on the night of June 1, 2005, *at the earliest*.  See Rose E-mail, June 1, 2005.  The Pennsylvania Action contains a subset of the allegations that are at issue in the California Action, inasmuch as FMC's Pennsylvania Action alleges two causes of action for copyright infringement.  AMVAC contends that this Court should not retain jurisdiction over the instant action because the ongoing matter that FMC contends is related to these parties' dispute, *i.e.*, Control Solutions, involves different parties, different transactions, and a different course of conduct than the instant dispute.[16]  While AMVAC's argument is technically correct, such acknowledgment does not make this Court's maintenance of jurisdiction of the FMC/AMVAC dispute somehow improper, inefficient or inequitable, inasmuch as the Court finds that, in comparing the facts and legal issues from Control Solutions to the instant matter, significant similarities exist.[17]  See Polaroid, 213 F.Supp. at 381 ("weight is given not to inconsequential priority in filing time but to substantial commitment to the cause, usually pre-trial involvement for many months, by the court first acquiring jurisdiction").

AMVAC's bifenthrin registrations included product labels that AMVAC presented to FMC for review in 2003.  Approximately five (5) months after receiving the compensation for its scientific and technical data, and more than a year after receiving copies of AMVAC's labels,

---

[16] As of the date of this Memorandum, the Court has been notified that the remaining issues in Control Solutions are subject to a settlement agreement.

[17] Unlike the current dispute, Control Solutions did not involve a data compensation agreement.

FMC accuses those same AMVAC labels of copyright infringement.  AMVAC argues that it

initiated the California Action on May 26, 2005, because AMVAC believes it needed to "confirm

its rights under the $2.7 million agreement and to prevent FMC from disparaging AMVAC in the

marketplace."[18]  At the time, AMVAC contends that through a May 19, 2005 letter sent by FMC

(the "FMC Distributor Letter") to certain pesticide distributors, FMC "misinformed AMVAC's

customers that AMVAC does not have the right to sell its products and that AMVAC will not be

able to continue to supply its customers."  This statement as justification for AMVAC's

institution of suit is not supported by the record.  The FMC Distributor Letter states in pertinent

part:

> Dear Distributor:
>
> On May 16, 2005, The United States District Court found that Control
> Solutions, Inc. (CSI) has willfully violated FMC's copyright in TalstarOne
> . . . and is willfully selling its Bifen I/T product with an infringing label.  CSI
> also knowingly and willingly assisted other generic manufacturers to label
> their respective bifenthrin-based products with a similarly infringing label.[19]

---

[18] AMVAC was aware of the Control Solutions case prior to filing the California Action.  However, in the initial California Action filing, AMVAC failed to mention Control Solutions or this Court's Memorandum and Order of May 16, 2005.  Such a presumably conscious failure to highlight a major prospective issue, in addition to the disquieting apparent lack of courtesy and professionalism with regard to AMVAC's failure to appropriately notify, and serve the California Action directly upon, FMC's Wolf Block counsel (the lawyers with whom AMVAC had been actively negotiating immediately prior to the filing) supports FMC's theory that AMVAC was indeed racing to its local courthouse steps while also trying to lull FMC into believing that it was negotiating in good faith.

[19] In a letter dated June 3, 2005, counsel for AMVAC alleges that:

> [W]e are informed that FMC is using this statement ["CSI also knowingly and willingly
> assisted other generic manufacturers to label their respective bifenthrin-based products with
> a similarly infringing label"] when contacting Amvac's customers to confuse Amvac's
> customers into believing that Amvac is bound by the [Control Solutions] order.  This is an
> improper interference with Amvac's business relationships and is negatively affecting
> Amvac's business with these customers right now.

Letter from A. Rose to A. Fletman, dated June 3, 2005.  No evidence has been presented to the Court to support this AMVAC allegation.

> The Court has issued a preliminary injunction ordering [CSI] and any entity acting in concert with CSI , to:  (1) stop manufacturing the infringing label or causing the label to be manufactured; (2) halt using the infringing label; (3) stop placing any product that has the infring label affixed to it into the stream of commerce; (4) destroy all existing infringing labels; and (5) immediately provide all of Bifen I/T's distributors, customers and sub-registrants with a copy of the preliminay injunction order.
>
> . . .
>
> We know you will comply with the Court's ruling in this case. . . .

Thus, a plain reading of the FMC Distributor Letter only reveals that its language is vague, inasmuch as it puts distributors on notice of FMC's "win" in <u>Control Solutions</u>.[20]   The letter's language that apparently so offended AMVAC does not, in fact, include a specific reference to AMVAC or any manufacturer other than Control Solutions.  Therefore, AMVAC's numerous allegations that FMC "was contacting AMVAC's distributors suggesting that AMVAC does not have the right to sell its Bifenthrin-based products" and that "AMVAC is being severely and irreparably harmed by FMC's improper activities [with regard to the FMC Distributor Letter]" appears to be at least a hyperbolic overstatement.  <u>See, e.g.</u>, AMVAC Post Arg. Br. at 2; Letter from Arthur Rose (AMVAC counsel) to Abbe Fletman (FMC counsel), dated June 14, 2005; Second Supp. Wintemute Dec. ¶ 6.

The FMC Distributor Letter shows no direct disparagement, but rather, at most, public passive-aggressive posturing or a "shot over the bow" by FMC towards other competitors who may have copied FMC's labels and, thus, FMC is putting them on notice that at least one court

---

[20] In the <u>Control Solutions</u> decision of May 16, 2005, the Court entered a preliminary injunction in favor of FMC that, *inter alia*, enjoined Control Solutions from continuing to label and sell its product, Bifen I/T, until it received approval for a non-infringing label from the EPA.  <u>See</u> <u>Control Solutions</u> Order.

has deemed such behavior (in at least one case) as justifying an injunction for potential copyright infringement.

Otherwise, the record is clear that FMC (through correspondence initiated by Wolf Block) had given AMVAC until May 27, 2005, to accept FMC's terms or face a lawsuit with regard to the copyright infringement allegations. Thus, on the facts stated above, including (i) AMVAC's conscious choice to file the California Action prior to FMC's May 27 deadline, (ii) counsel for AMVAC's disregard of the conventional professional courtesy of providing contemporaneous notice of the California Action to Wolf Block of its litigious intentions (in light of the ongoing negotiations) and (iii) the manner in which AMVAC thereafter notified FMC and Wolf Block on the night of June 1, 2005 (apparently as a mere afterthought to Wolf Block's "heads-up" with regard to FMC's June 1 filing of the Philadelphia Action), the Court concludes that AMVAC's California Action can only be construed as one (or some combination) of the following -- inequitable conduct, bad faith, anticipatory filing, forum shopping or avoidance.[21] See EEOC, supra, 850 F.2d at 972.  Therefore, consistent with the guidance established by

---

[21] Nonetheless, AMVAC counters that it believed the negotiations with FMC had been terminated by May 26, 2005, and AMVAC therefore had the right to file the California Action.  From the record, it appears that negotiations between FMC and AMVAC had been continuing, on-and-off, since March 2005, when FMC first began to address its belief that competitors such as Control Solutions, AMVAC and others were infringing on the copyrights FMC holds in certain of its product labels.  In sum, AMVAC contends that, by May 26, 2005, it had become so frustrated with alleged threats of litigation that AMVAC chose to act.  Nonetheless, prior to the filing of the California Action, it also appears from a full review of the record that FMC, through both its executives and its lawyers, had been attempting to negotiate in good faith.  Even if what AMVAC states is true, *i.e.*, the parties could not come to an agreement if FMC refused to allow AMVAC to continue selling its product during the pendency of new, non-infringing AMVAC labels being reviewed by the EPA, FMC's position on the issue did not amount to a justification for the AMVAC's dash to the courthouse.

Moreover, it appears that FMC's attempt to negotiate from what it believed to be a more persuasive position became more earnest in the days after this Court's ruling in Control Solutions.  Thus, it appears from the record here that FMC, at the time AMVAC decided to file the California Action, was certainly trying to leverage the Control Solutions ruling against AMVAC for its alleged copyright violations.  It is unlikely that AMVAC missed the point.

EEOC, any of these exceptions to applications of the first-to-file rule justifies this Court's denial of the AMVAC Motion.


**C.     Applying the First-to-File Rule and its Exceptions**

In EEOC, supra, at 971-72, the Court of Appeals for the Third Circuit explained that "[t]he first-filed rule encourages sound judicial administration and promotes comity among federal courts of equal rank.  It gives a district court 'the power' to enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court."  EEOC, supra (citing Triangle, 125 F.2d at 1009).

The EEOC court affirmed the district court's declination to follow the first-to file rule and denial of a motion to dismiss an enforcement action that was filed after the commencement of a parallel case in another district court.  Id. at 971-72.  In that case, a junior member of the faculty at the University of Pennsylvania (the "University") filed charges of discrimination with the EEOC.  Id. at 972.  During the course of the investigation, the University refused to release confidential peer review materials relating to the complainant's tenure review process.  Id.  When the EEOC denied the University's request to modify the subpoena, the EEOC threatened to institute an enforcement proceeding within 20 days unless the University complied.  Id. at 973.  The University filed suit in the District of Columbia three days prior to the EEOC's deadline.  Id.  During oral argument on the motion to dismiss, counsel for the University could not deny that the University filed its declaratory judgment action in another district to avoid an adverse decision in

this circuit.  Id.[22]  A decision to file an action in another judicial district because the filing party

believes the other district provides some benefit, such as the one sought out by the University, is

considered either forum shopping or forum avoidance and is sometimes frowned upon for

reasons of equity.  Therefore, because the EEOC court found that the University filed its action in

the District of Columbia to win the "race to the courthouse" with an anticipatory filing, preferring

to have the federal court in the District of Columbia adjudicate the parties' dispute, the EEOC

court refused to apply the first-to-file rule.

        Not only does EEOC contain the controlling legal standard to be applied in the instant

case, but the Court also finds that the facts from EEOC are analogous to the instant matter.

EEOC involved an imminent subpoena enforcement action by the EEOC and a precedent from

the District Court for the District of Columbia that suggested hostility toward the EEOC's

position.  Three days prior to an EEOC deadline, the University of Pennsylvania filed a lawsuit in

the District of Columbia, a forum perceived by the University to be more friendly to its position.

The EEOC then filed its own lawsuit in the Eastern District of Pennsylvania.  Under those

circumstances, where the University filed a lawsuit instead of complying with the subpoena or

notifying EEOC of its intention to contest the EEOC's demand, the Court of Appeals for the

Third Circuit found that departure from the first-to-file rule was appropriate.  Here, of course,

AMVAC was faced with an imminent deadline established by FMC.  FMC, in fact, filed its

Pennsylvania Action (in the court where Control Solutions was adjudicated) within two business

days of that deadline and without knowledge of AMVAC's California Action.

---

[22] Similarly, after reviewing the Control Solutions decision that enjoined one of FMC and AMVAC's
competitors from selling its product with an allegedly infringing label, it makes logical sense that AMVAC would try
to avoid the venue where the Control Solutions matter was adjudicated.

In addition to the controlling opinion in <u>EEOC</u>, other courts have held that a lawsuit is "anticipatory" (and therefore subject to dismissal or transfer, or not entitled to the benefits of the first-filed rule) under circumstances similar to the instant matter.  For example, in <u>Drugstore-Direct, Inc. v. The Cartier Division of Richemont North America, Inc.</u>, 350 F.Supp.2d 620 (E.D. Pa. 2004), the court held that a first-filed case in Pennsylvania was anticipatory and granted a motion to dismiss in favor of a second-filed case in New York.  The correspondence between the parties in <u>Drugstore-Direct</u> showed that the parties were attempting to settle the dispute without litigation, but the alleged infringer filed a declaratory judgment action just before a negotiating deadline set in a demand letter.  <u>Id.</u> at 623.  Because the putative copyright holder delayed its filing in reliance on ongoing settlement negotiations, and the short amount of time (four business days) between the declaratory judgment filing and the coercive action, the first-filed action was deemed anticipatory.  <u>Id.</u>  Similarly, here, the record supports FMC's temporal version of events that it filed the Pennsylvania Action within two (2) business days following the deadline given to AMVAC, and, at the time, FMC had no knowledge of the California Action.  <u>See</u> Rose E-mail, June 1, 2005.

Contrary to AMVAC's assertion that exceptions to the first-filed rule are rare, the <u>Drugstore-Direct</u> court stated:

> Exceptions to the first-filed rule **are not rare** and are made when justice or expediency requires, including when the first-filed action is the result of forum shopping and if the balance of convenience favors the second forum.

<u>Id.</u>  (quoting <u>Hunt Mfg. Co. v. Fiskars Oy Ab</u>,1997 WL 667117 at *3 (E.D. Pa. Oct. 2, 1997)) (emphasis added).  Moreover, a second-filing party may have a strong case that the initial filing is improper if the first-filing party initiated its suit within the response period provided in a recent

cease-and-desist letter.  See Eui Seob Kim v. Su Heon Kim, 324 F. Supp. 2d 628, 636 (E.D. Pa. 2004).  Other federal courts concur.[23]

Under the view espoused in the AMVAC Motion, the first-to-file rule should be applied rigidly to require dismissal of all second-filed actions regardless of equities or circumstances.  As stated above, EEOC considered and rejected such a view of the rule, holding that, for the courts within this Circuit, the first-filed rule "is not a mandate directing wooden application of the rule without regard to rare or extraordinary circumstances, inequitable conduct, bad faith, or forum shopping."  Id. at 972.  Rather, the EEOC court added to the list of exceptions, recognizing an "anticipatory filing" exception that the Court finds should be applied in this matter.  Accordingly, the EEOC court held the first-filed rule did not apply because the motivation for the first-filed action was to circumvent local law and preempt an imminent filing in the Eastern District of Pennsylvania.  Id. at 972.  It appears from the instant record that AMVAC wished to circumvent this Court's jurisdiction over the instant matter as a "related action" and preempt FMC's filing in the Eastern District of Pennsylvania.

---

[23] See, e.g., Factors, Etc. v. Pro Arts, Inc., 579 F.2d 215, 219 (2d Cir. 1989) (exception to the first-filed rule where declaratory judgment action was triggered by a notice letter and filed in anticipation of a coercive suit); Z-Line Designs, Inc. v. Bell'O International LLC, 218 F.R.D. 663, 667 (N.D.Cal. 2003) ("where as here a declaratory judgment action has been triggered by a cease and desist letter, equity militates in favor of allowing the second-filed action to proceed to judgment rather than the first"); Chicago Ins. Co. v. Holzer, 2000 WL 777907 at *2 (S.D.N.Y. 2000) (filing of declaratory judgment action triggered by a notice letter is a "persuasive indicator of anticipatory conduct"); Charles Schwab & Co., Inc. v. Duffy, 1998 WL 879659 at *1 (N.D. Cal. Dec. 8, 1998) (applying the first-filed rule in cases of anticipatory suits "would thwart settlement negotiations, as intellectual property holders would feel compelled to file suit rather than communicate with an alleged infringer"); Hanson PLC v. Metro-Goldwyn-Mayer, Inc., 932 F. Supp. 104, 107 (S.D.N.Y. 1996) ("Where the first-filed case is a declaratory judgment action precipitated by a demand letter and filed in anticipation of the later action, the second-filed action will be allowed to go forward in plaintiff's chosen forum"); NSI Corp. v. Showco, Inc., 843 F. Supp. 642, 645 (D. Or. 1994) ("first-filed" rule does not apply where "the party seeking declaratory judgment unfairly took advantage of the other in a race to the courthouse"); Bausch & Lomb Inc. v. Alcide Corp., 684 F. Supp. 1155, 1159-60 (W.D.N.Y. 1987) (the court declined to enjoin second-filed action and accordingly transferred first-filed action where the first-filed action was anticipatory and unnecessarily "raised the sword of litigation").

This Court also finds <u>Optical Recording Corp. v. Capitol-EMI Music, Inc.</u>, 803 F. Supp. 971 (D. Del. 1992), to be instructive and persuasive.  <u>Optical Recording</u> is a patent case in which the district court declined to follow the first-to-file rule.  The court denied both a motion to dismiss the patent action and a motion to transfer based on the first-filed rule, stating the court was already familiar with the intellectual property at issue since it had recently resolved a factually similar case brought by that plaintiff against a similar defendant.  <u>Id.</u> at 973.  The court had tried an earlier case involving the same patents at issue and explained that it could depart from the first-filed rule if it was in a better position to preserve judicial resources and avoid duplication.  Considering policy issues such as avoiding duplicative litigation and wasting judicial resources, often cited as concerns in conjunction with the first-filed rule, the <u>Optical Recording</u> court determined that it is "equally reasonable and practical for a district court not to defer to the first-filed jurisdiction if the court can demonstrate that the second-filed court can insure that it is in a better position to preserve judicial resources and avoid duplication."  <u>Id.</u> Therefore, based on the fact that it had recently concluded a similar case against a different defendant, the <u>Optical Recording</u> court determined that its "familiarity with the subject matter of the litigation will reduce the expenditure of judicial resources in handling this matter."  <u>Id.</u>  at 974.  That fact alone was viewed as sufficient to justify departure from the first-filed rule.  <u>Id.</u> Such practical circumstances, AMVAC contends, do not exist here.

The Court disagrees.  The Court analyzed nearly identical copyright infringement arguments in <u>Control Solutions</u> only some 10 weeks ago, including receiving lengthy testimony with regard to data compensation agreements, even though such an issue was not potentially dispositive to that case, as it could be here.  Here, save for the fact that copyrights are at issue in

this case, as opposed to patents, the considerations in the instant case appear nearly factually indistinguishable from Optical Recordings.  See also, Polaroid, 213 F.Supp. at 381 ("weight is given not to inconsequential priority in filing time but to substantial commitment to the cause, usually pre-trial involvement for many months, by the court first acquiring jurisdiction").  Thus, because the Court has assessed similar fact-intensive FIFRA issues and copyright infringement claims in its 77-page Control Solutions decision, declining the instant AMVAC Motion very likely will conserve judicial resources despite the fact that the instant matter involves also a slightly different course of conduct, rather straightforward affirmative claims by AMVAC, and an interpretation of how the DCA governs the litigants' rights and obligations.  Id.

Furthermore, the Court cannot agree with AMVAC that the "rare and extraordinary" exceptions to the first-to-file rule are not present here.  See EEOC, 850 F.2d at 972.  On the contrary, the Court finds that some aspect of each of the first-to-file exceptions exists with regard to the instant matter.[24]

---

[24] AMVAC argues that FMC was perfectly happy *not* to sue AMVAC, because FMC was enjoying success in the marketplace against AMVAC by allegedly misrepresenting the effect of the Control Solutions decision.  The Court finds, however, such an argument cuts both ways, inasmuch as AMVAC could have filed its California Action in early March 2005 upon first learning of FMC's claims of copyright infringement.  Instead, it appears from the record that both parties to the instant litigation declined to take more affirmative steps until after this Court's Control Solutions decision was rendered.

During oral argument, held by the Court on June 29, 2005, AMVAC's counsel conceded that, in fact, AMVAC did not seek declaratory relief prior to the Court's Control Solutions decision because:

> . . . there were discussions ongoing, and we had hoped to resolve the dispute regarding the interpretation of the language.  And we were unsuccessful in doing that, and reached a point where we decided we needed to have success because of the [alleged] behavior of FMC in the marketplace.

Tr. at 10-11.

AMVAC contends that the facts of the instant matter are very similar to those of <u>IMS Health</u>.  <u>IMS Health, Inc. v. Vality Tech., Inc.</u>, 59 F.Supp.2d 454, 462 (E.D. Pa. 1999) (enjoining prosecution of second-filed copyright infringement action in favor of earlier-filed declaratory judgment suit recognizing that a party accused of copyright infringement is permitted to seek affirmative declaration of its freedom from liability when threat of lawsuit is "looming in the indeterminate future").  There, IMS had entered into a series of agreements with Vality to use Vality's software.  After entering into those agreements, Vality then alleged that IMS had engaged in unauthorized use of Vality's copyrighted software.  The parties conducted an initial meeting and attempted to negotiate a settlement over a three-and-a-half month period.  IMS eventually filed a declaratory judgment action to seek a clarification of its rights to use the software, and Vality filed a second suit that included claims for copyright infringement.  The <u>IMS Health</u> court enjoined Vality's prosecution of the second case in favor of first-filed declaratory judgment action, finding that the IMS lawsuit did not meet the "anticipatory lawsuit" exception.  The court found that IMS did not act in bad faith, because Vality allowed its numerous litigation deadlines to expire without consequence.  Further, IMS did not immediately commence litigation, but instead negotiated in good faith.  Finally, IMS argued that it had a legitimate connection to the forum of the first-filed action, where its headquarters, witnesses, and documents were located.

Moreover, AMVAC contends that <u>IMS Health</u>, on which it attempts to rely, distinguishes <u>EEOC</u>, <u>supra</u>, on two grounds.  <u>See</u> <u>IMS Health</u>, 59 F.Supp.2d at 462.  In <u>EEOC</u>, the express 20-day deadline to initiate subpoena enforcement proceedings made the litigation by EEOC imminent.  AMVAC contends that because negotiations between the instant parties had started

and stopped previously, that the May 20, 2005 cease-and-desist letter did not cause AMVAC to believe that FMC-initiated litigation was imminent.  FMC's prompt filing after expiration of its deadline and with ignorance of the California Action belies AMVAC's argument.  Second, <u>IMS Health</u> found that there was precedent within the facts of <u>EEOC</u> establishing that the District of Columbia court likely would be friendly to the University's position.  AMVAC contends that no preferential reasoning spurred its filing of the California Action in that venue.  Here, the Court is constrained to point out that it is reasonable to think that because of the significant similarities between FMC's copyright allegations in both the instant matter and <u>Control Solutions</u>, AMVAC would try to avoid the result experienced by Control Solutions, a fellow competitor to FMC, in what would likely be FMC's chosen forum, the Eastern District of Pennsylvania.[25]

---

[25] Courts condone neither forum shopping nor forum avoidance.  In either situation, a court has the discretion to depart from the first-to-file rule.  <u>See</u> <u>EEOC</u>, <u>supra</u>.  There is no requirement that a court find that the first-filing plaintiff was motivated *solely* by forum shopping for that court to apply the controlling <u>EEOC</u> exceptions to the first-to-file rule.  As the Court of Appeals for the Third Circuit has stated, "[b]ecause the first-filed rule is based on principles of comity and equity, it should not apply when **at least one** of the filing party's motives is to circumvent local law and preempt an imminent . . . action [in the local forum]."  <u>EEOC</u>, 850 F.2d at 978.  Thus, AMVAC's reliance on <u>Eui Seob Kim v. Su Heon Kim</u>, <u>supra</u>, 324 F.Supp.2d 628, is misplaced.  In <u>Eui Seob Kim</u>, the court found that defendants offered no evidence that plaintiff was seeking "to avoid unhelpful law or benefit from favorable law."  <u>Id.</u>  Here, on the contrary, the Court finds that many of EEOC's equitable exceptions apply.

Thus, a court should determine whether a party is attempting to evade "negative law," or "forum avoidance," when "forum shopping" is alleged.  <u>See</u> <u>Stone Creek Mechanical, Inc. v. Carnes Co., Inc.</u>, 2002 WL 31424390 at *2 (E.D.Pa. Oct. 25, 2002) (rejecting plaintiff's attempt to characterize defendant's actions as forum shopping after analyzing whether defendant's first-filed action was "motivated by a desire to avoid negative law in the Third Circuit or seek shelter under more favorable law" in a different court).  Additionally, a litigant should not be permitted to resist the transfer of his case to another court on the ground that the transferee court "will or may interpret federal law in a manner less favorable to him [inasmuch as] [w]e have no simpathy with shopping around."  <u>See</u> <u>Polaroid Corp.</u>, 213 F.Supp. at 384 (<u>quoting</u> <u>Clayton v. Warlick</u>, 232 F.2d 699, 706 (4th Cir. 1956).  <u>See also</u>, <u>cf.</u> <u>Wireless Consumer Alliance, Inc. v. T-Mobile USA, Inc.</u>, 2003 WL 22387598 at *6 (N.D.Cal Oct. 14, 2003) (holding that attempting to "avoid a particular judge or precedent[] is exactly the kind of forum shopping anticipated and expressly prohibited by the local rules of many districts") (citations omitted).  Finally, despite the fact that <u>Control Solutions</u> is not a controlling decision, it is likely not a decision that AMVAC would happily embrace.  Therefore, the Court finds the following discussion from the District Court for the District of Columbia with regard to forum shopping and forum avoidance to be instructive:

> [T]he transfer provisions in the U.S. Code, which great [sic] out of the common law doctrine of *forum non conveniens,* were in part intended to prevent forum shopping.  This Court

Nonetheless, AMVAC contends the instant case is on all fours with <u>IMS Health</u>.   The

Court does not agree.  Significant evidence of the types of exceptions to first-to-file rule, as

described by <u>EEOC</u>, distinguish the instant matter from <u>IMS Health</u>.  Consistent with the

<u>EEOC</u>'s analysis that inequitable conduct, bad faith, forum shopping and anticipatory filing

militate against a knee-jerk application of the first-to-file rule, the Court notes the following

recent factual history of the FMC-AMVAC relationship and dealings with each other:

> * Negotiations between FMC and AMVAC were on-going as a result of FMC's letter, dated March 4, 2005, alleging that AMVAC was infringing certain of FMC's pesticide product labels.  <u>See</u> Letter of March 4, 2005, from FMC's counsel to AMVAC's counsel; Letter of April 12, 2005, from FMC's counsel to AMVAC's counsel; and Letter of April 20, 2005, from AMVAC's counsel to FMC's counsel.

> * On May 20, 2005, FMC sent a cease-and-desist letter to AMVAC demanding that AMVAC respond to its post-<u>Control Solutions</u> letter within five (5) business days (*i.e.*, by **Friday, May 27, 2005**) or face a lawsuit.

> * In response to FMC's May 20 letter, on Monday, May 23, 2005, Eric Wintemute, AMVAC President and Chief Executive Officer called Milton Steele, FMC Vice President and General Manager, to request that, *inter alia*, settlement terms include the following:  (i) the parties would agree on monetary settlement terms and (ii) AMVAC would be permitted to continue its sales of currently existing bifenthrin-based products while the AMVAC labels were redrafted to address FMC's copyright infringement allegations.  <u>See</u> Supp. Wintemute Decl.

---

cannot find that it is in the interest of justice to encourage, or even allow, a plaintiff to select one district exclusively or primarily to obtain or avoid specific precedents, particularly in circumstances such as these where the relevant law is unsettled and the choice of forum may well dictate the outcome of the case.

. . .

While choice of an advantageous forum alone might not warrant a transfer, as plaintiff asserts, when such forum shopping is considered with the other factors in this case, *i.e.,* the complete lack of nexus with [this district court] and the relatively more convenient forum available in the [another district court], it is clear that this case should be transferred to that district.

<u>Turner v. Newall, PLC v. Canadian Universal Ins. Co.</u>, 652 F.Supp. 1308, 1312 (D.D.C 1987) (citation omitted).

* On May 24, 2005, Mr. Steele e-mailed Mr. Wintemute with regard to the prior day's negotiations indicating that FMC would not permit AMVAC to continue selling its products with the allegedly infringing labels as a term of settlement. Id. ¶ 7.  Mr. Steele's email concludes:

> After we receive your proposal, it may be useful to have a teleconference involving our legal counsel to try to iron out final terms.  *In your response*, please propose some available dates/times for us to talk *later this week*.

See E-mail from M. Steele to E. Wintemute, dated May 24, 2005 (emphasis added).  The record contains no documented response to Mr. Steele's May 24 e-mail nor does the record contain any representation from Mr. Wintemute or AMVAC's counsel that AMVAC explicitly informed FMC that negotiations were terminated because AMVAC found the terms of Mr. Steele's email to be untenable.  In fact, during oral argument on June 29, 2005, AMVAC's counsel conceded that, in fact, AMVAC did not seek declaratory relief prior to the Court's Control Solutions decision because:

> . . . there were discussions ongoing, and we had hoped to resolve the dispute regarding the interpretation of the language.  And we were unsuccessful in doing that, and reached a point where we decided we needed to have success because of the [alleged] behavior of FMC in the marketplace.

Tr. at 10-11.

* Nonetheless, apparently while in the midst of on-going negotiations, prior to the FMC deadline, on **Thursday, May 26, 2005**, *right before the Memorial Day holiday weekend*, AMVAC filed the California Action.

* Rather than serve (or even inform) FMC's **Pennsylvania** lawyers from Wolf Block with whom AMVAC and its counsel had been negotiating, on **Friday, May 27, 2005**, AMVAC served the California Action on **FMC's registered agent** *in Delaware late in the afternoon on the eve of the long Memorial Day weekend.*

* Before FMC's counsel learned of the California Action, FMC, on **June 1, 2005**, filed the Pennsylvania Action.

* FMC and Wolf Block did not learn of the California Action until **Wednesday, June 1, 2005,** *at approximately 10:00 p.m.*, in the middle of the week following the California Action filing, and only after Wolf Block, still unaware of the California Action, advised

-26-

and sent (as an e-mail attachment) AMVAC's counsel a copy of the Pennsylvania Action that had been filed earlier on *that same day*, June 1.

* An email, dated **Wednesday, June 1, 2005 at 9:52 p.m.**, from AMVAC's counsel to FMC's counsel, is AMVAC's first, almost casual, mention of the California Action:

> Thank you for sending us a copy of the complaint you filed on behalf of FMC **today** [June 1, 2005]. I am wondering if you could also send us a copy of the exhibits attached to the complaint. A copy of the complaint **we filed on [May 26, 2005]** is attached. Thank you.

See e-mail from Art Rose to Abbe Fletman, June 1, 2005, **9:52 PM** (subject: FMC's Complaint) (emphasis added).

* AMVAC has not disputed the fact that they did not previously or otherwise inform Pennsylvania counsel of the California Action.[26]

Therefore, pursuant to the exceptions established by <u>EEOC</u>, and because the facts above establish that each of the types of inequitable conduct from <u>EEOC</u> exist within the instant record, the Court declines to apply the first-to-file rule.

### D.   Staying the Instant Action

---

[26] As further evidence of AMVAC's calculating and disingenuous conduct, the Court need only review AMVAC's own words:

> 8.   I have been informed and believe that a complaint was filed on behalf of AMVAC on Thursday, May 26, 2005 and properly served on FMC *in Delaware* on Friday, May 27, 2005. **In view of our cordial relationship**, I wanted to personally inform Mr. Steele of AMVAC's decision to let the courts resolve this matter.

> 9.   On Tuesday, May 31, 2005, I called Mr. Steele. Friday, May 27, 2005, I was out of the office on pressing business matters and Monday, May 30, 2005, was a holiday.

> 10.   Mr. Steele returned my call on Wednesday[,] June 1, 2005. During our conversation I told Mr. Steele that in view of FMC's rejection of our key settlement requirement the court would have to help us sort out these issues.

Second Supp. Wintemute Decl., ¶¶ 8-10 (emphasis added). Apparently, the Wintemute-Steele relationship was not so cordial (or respectfully professional) for Mr. Wintemute to take the time to call Mr. Steele on May 26, rather than 5 days later, on May 31, to inform FMC of the California Action.

Alternatively, AMVAC suggests that if the Court finds dismissal to be inappropriate at this time, the first-to-file rule also permits a stay of this action in favor of the first-filed California lawsuit.  See Ultronic Systems Corp. v. Ultronix, Inc., 217 F. Supp. 89 (D.Del. 1963).  A stay is consistent with the first-to-file rule, inasmuch as it may eliminate duplicative litigation in California and Pennsylvania, and it would avoid an outcome in which two actions are proceeding in parallel in different district courts.  Nevertheless, for the reasons outlined above, the Court finds that staying this action would conserve the resources of neither the parties nor the courts.


### E.      Transfer Pursuant to 28 USC § 1404(a) is Not Warranted

An alternative option available to this Court is to transfer this action to the Central District of California, pursuant to 28 U.S.C. § 1404(a).  Section 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

A party moving to transfer pursuant to § 1404(a) must establish that (1) the action could have been brought in the transferee district (here, the Central District of California) and (2) transfer will serve both the convenience of parties and witnesses and the interest of justice. Waste Distillation Technology, Inc. v. Pan American Resources, Inc., 775 F. Supp. 759, 762 (D. Del. 1991).  This Court has discretion in deciding whether to transfer an action.  Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29, 108 S. Ct. 2239, 2243-44 (1988).  With regard to the decision to transfer, a district court must consider "all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum." Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir.

1995); see also, Stewart, 487 U.S. at 29, 108 S. Ct. at 2243-44 (noting that § 1404(a) gives

courts discretion to adjudicate transfer motions according to an "individualized, case-by-case

consideration of convenience and fairness"); see also, Van Dusen v. Barrack, 376 U.S. 612, 616,

84 S. Ct. 805, 809 (1964).

Pursuant to 28 U.S.C. § 1404(a), a federal district court may transfer an action to any

other district or division where the suit might have been brought "[f]or the convenience of parties

and witnesses" or "in the interest of justice." Within our circuit, it is well-established that in

ruling on a defendant's motion to transfer, "the plaintiff's choice of venue should not be lightly

disturbed." Jumara v. State Farm Ins. Co., 55 F.3d 873, 879 (3d Cir. 1995); see also, Elbeco Inc.

v. Estrella de Plato, Corp., 989 F. Supp. 669, 678 (E.D. Pa. 1997) (denying motion to transfer

venue) ("[A]lthough the decision to transfer is in the court's discretion, transfers should not be

liberally granted." Moreover, on a motion to transfer venue, courts may consider whether the

declaratory plaintiff's first-filed action was anticipatory and/or the product of forum-shopping.

See, e.g., One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc., 987 F. Supp. 317 (D.N.J.

1997).

Additionally, "where a plaintiff chooses his home forum[,] the choice is entitled to great

deference." Endless Pools, Inc. v. Wave Tec Pools, Inc., 362 F. Supp.2d 578 586-87 (E.D. Pa.

2005) (denying motion to transfer venue). FMC filed its copyright infringement action in its

home forum, where the company is located and its products are developed. Also, FMC has

suggested that putative copyright holders are entitled to litigate infringement claims in their

choice of forum, even though the Copyright Act does not provide such explicit language. See,

e.g., Miss America Org. v. Mattel, Inc., 945 F.2d 536, 543 (2d Cir. 1991) (holding that Section

501 of the Copyright Act grants "the copyright holder its choice of forum and express[es] a policy of giving the holder an advantage over the alleged infringer.").

AMVAC argues that because the California action includes a claim for declaratory relief of non-infringement, FMC could have brought compulsory counterclaims for copyright infringement in the California action. See Fed. R. Civ. P. 13(a) (requiring parties to bring compulsory counterclaims arising out of the same transaction or occurrence). In fact, it is not difficult to conclude from even a cursory review of these two cases that either action can be easily consolidated in the other venue.

Finally, the burden of establishing the need for transfer requires a showing that "the balance of convenience of the parties and witnesses *strongly favors* the defendant." Adams v. Crowley, 2005 WL 1240181 at * (D. Del. May 25, 2005) (citing Shutte v. Armco Steel Corp., 431 F.2d 22, 25 (3d Cir. 1970)) (emphasis added); see also, Endless Pools, 362 F. Supp.2d at 578. No such showing has been made here by AMVAC.

The other factors to be considered on a § 1404(a) motion, if applicable, are: (1) plaintiff's forum preference; (2) defendant's preference; (3) where the claim arose; (4) the convenience of the parties and witnesses; (5) the location of the relevant books and records (collectively, the "private interests"); (6) the enforceability of the judgment; (7) "practical considerations that could make the trial easy, expeditious, or inexpensive"; (8) relative court congestion; (9) local interest in deciding local controversies at home; (10) public policies of the fora; and (11) the familiarity of the trial judge with applicable state law in diversity cases (collectively, the "public interests"). See Jumara, 55 F.3d at 879-80. Considering AMVAC as the instant defendant, it has not met its burden pursuant to the balancing of factors governing the transfer of venue.

-30-

In <u>One World</u>, the court considered the declaratory plaintiff's motion to either dismiss or, in the alternative, transfer the later-filed party's action pursuant to § 1404(a).  Rejecting the declaratory plaintiff's motion to transfer, the court followed <u>EEOC</u>, <u>supra</u>, and expressly applied its holding in the § 1404(a) context because the declaratory plaintiff was attempting to avoid unfavorable precedent from the Court of Appeals for the Third Circuit, and, thus, "the principles underlying the first-filed rule were 'better served by rejecting the University's effort to dismiss the second-filed suit.'"  <u>One World</u>, 987 F. Supp. at 328 (citing <u>EEOC</u>, 850 F.2d at 979).  This consideration of obvious forum-shopping, along with the court's recognition of an anticipatory suit, were persuasive reasons for denying the attempted transfer.  <u>Id.</u> at 328-29 (observing that when "the party instituting the first action (*i.e.*, for declaratory judgment) intended to preempt a later suit (*i.e.*, for infringement)[,]" "anticipatory litigation of [this] nature is disfavored") (citations omitted).

<u>One World</u> appears on point here, inasmuch as it appears that AMVAC filed its declaratory action at least in part to seek refuge from this Court's decision in <u>Control Solutions</u>, and "tossed aside potentially fruitful negotiations" with FMC to establish itself as first-filed.  <u>See</u> FMC Memorandum in Opposition at 19.  Consistent with <u>One World</u>, the Court will not reward AMVAC with a transfer of venue.  In addition, the relevant <u>Jumara</u> factors weigh heavily against transfer.  Judicial economy and common sense seem to favor resolving the instant litigation in this Court.  <u>See</u> <u>Supco Automotive Parts, Inc. v. Triangle Auto Spring Co.</u>, 538 F. Supp. 1187, 1192 (E.D. Pa. 1982) (presence of related proceeding dominated consideration of venue factors).  Additionally, "Pennsylvania has a strong interest in protecting its residents and providing a forum

for resolution of their disputes." Elbeco, Inc., 989 F. Supp. at 678 (citing Grand Entertainment

Group v. Star Media Sales, 988 F.2d 476 (3d Cir. 1993)).

Therefore, FMC will be permitted to pursue its copyright infringement action in this

forum.  FMC's copyright claim arose in the Eastern District of Pennsylvania.  Damages suffered

as a result of another's infringement are likely to substantially occur in the plaintiff's home

forum. See Endless Pools, 362 F. Supp.2d at 578 (citing Indianapolis Colts v. Metro. Balt.

Football Club Ltd. Partnership, 34 F.3d 410, 412 (7th Cir. 1994)).  Second, the "locus of

operative facts" for an action initiated by cease-and-desist letters, responding to which the

alleged infringer brings a declaratory action, is the location from which the cease-and-desist

letters were sent.  See, e.g., Dostana Enterprises LLC v. Federal Express Corp., 2000 WL

1170134 (S.D.N.Y. Aug. 16, 2000).  Finally, "transfer is not warranted if the effect is merely to

shift the inconvenience from one party to the other." Elbeco, Inc., 989 F. Supp. at 678. While

AMVAC may well have relevant documents and witnesses in California, FMC's sources of

proof, including documentary evidence and witnesses, are equally centered here in Pennsylvania.


V.   CONCLUSION

AMVAC has invited the Court to engage in a rather wooden review of the first-to-file

rule and its relationship to the instant matter involving alleged copyright infringement of

pesticide, miticide and termiticide product labels.  Engaging in such a limited view, however,

would eat away at the foundation of the well-established and controlling exceptions to the first-

to-file rule.  See EEOC, supra, 850 F.2d at 972 (holding that the first-to-file rule "is not a

mandate directing wooden application of the rule without regard to rare or extraordinary

circumstances, inequitable conduct, bad faith, [anticipatory filing] or forum shopping"). Furthermore, as discussed above, because this Court finds substantial similarities between the instant matter and <u>Control Solutions</u>, for the sake of judicial economy, the Court will retain jurisdiction over the instant matter.  See <u>Polaroid</u>, 213 F.Supp. at 381 ("weight is given not to inconsequential priority in filing time but to substantial commitment to the cause, usually pretrial involvement for many months, by the court first acquiring jurisdiction")  Thus, consistent with the guidance established by <u>EEOC</u>, and because the Court finds that AMVAC:  (1) made an anticipatory filing (by filing the California Action prior to expiration of FMC's 5-day deadline); (2) engaged in bad faith and inequitable conduct (by AMVAC's failing to contemporaneously, much less, prospectively inform or timely notify FMC's counsel or the company executive with whom AMVAC had been actively negotiating of the California Action); and (3) engaged in forum shopping and forum avoidance (conduct in which the Court finds no substantive difference), upon filing the California Action, each of the <u>EEOC</u> exceptions to the first-to-file rule are present.  Therefore, in the exercise of the Court's discretion and for reasons of comity and equity, this Court declines to apply the first-to-file rule to the instant matter, instead retaining jurisdiction over this matter.  The AMVAC Motion is denied.[27]

---

[27]       On July 25, 2005, the court before which the California Action is pending, denied AMVAC's *Ex Parte* Application for Preliminary Injunction.  In its "Findings of Fact," the California district court found:

> 17.  The Data Compensation Agreement does not by its terms authorize AMVAC to use FMC's labels to sell AMVAC's Wisdom TC Flowable and Discipline 2EC bifenthrin products.  (Froelich Decl. Ex. 5.).

> 18.  The Data Compensation Agreement entered into between the parties does not address the use of FMC's labels in connection with the sale or distribution of AMVAC's bifenthrin products.  (Froelich Decl. Ex. 5.).

> 19.  Section 5.01 of the Data Compensation Agreement provides that the $2.7 million is being paid by AMVAC to FMC "for the rights to the Studies . . ." (<u>Id</u>.).  As defined,

"Studies" does not mention or include product labels.  (Froelich Decl. Ex. 5, § 1.07).
. . .

31. Neither the May 19 Letter nor the Press Release mention AMVAC or state that AMVAC is subject to the <u>Control Solutions</u> decision.  Additionally, neither the May 19 Letter nor the Press Release suggest that AMVAC is bound by the <u>Control Solutions</u> decision.  Rather, both the May 19 Letter and Press Release quote or paraphrase from the <u>Control Solutions</u> decision.  <u>See</u> <u>Control Solutions</u>, 369 F. Supp. 2d at 545.

32.      AMVAC has not presented any evidence that the phrase "other generic manufacturers" as used in the May 19 Letter and Press Release refers to, implies, or otherwise insinuates that the <u>Control Solutions</u> decision applies to, binds, or otherwise encompasses AMVAC.

33. AMVAC has not submitted any evidence that any person understood (or misunderstood) the phrase "other generic manufacturers" in the May 19 Letter and Press Release to refer to AMVAC.  Nor is there any evidence that FMC intended that the phrase "other generic manufacturers" include, refer to, or encompass AMVAC.

34. There is no evidence that any person, including any customer or distributor of AMVAC's products, refused to buy AMVAC products as a result of the May 19 Letter or Press Release.  AMVAC also has not submitted any evidence that it has lost any sales of its bifenthrin-based products since the May 19 Letter or Press Release were issued.

35. AMVAC has not presented any evidence of any public statement or any statement to any third party by FMC other than the May 19 Letter and Press Release concerning the <u>Control Solutions</u> decision.  Nor has AMVAC presented evidence of any other communication or public statement that has stated, suggested, or implied that AMVAC is bound by the <u>Control Solutions</u> decision.

36. AMVAC claims that "AMVAC has gathered evidence . . . that FMC's representatives have suggested to AMVAC's customers that the [<u>Control Solutions</u>] order does in fact cover AMVAC's products."  (AMVAC's Memo. In Support of Temporary Restraining Order ("TRO Memo.") at 15).  However, other than the May 19 Letter and Press Release, AMVAC has not produced any admissible evidence that FMC (or any of its representatives) has made any statements concerning the <u>Control Solutions</u> decision or concerning AMVAC.  Nor has AMVAC produced any evidence, admissible or otherwise, concerning the substance, content, time, or place of any such statements.

Moreover, in its "Conclusions of Law," the California Action district court held:

46. The May 19 Letter and Press Release are true on their face.

47. The May 19 Letter and Press Release accurately and truthfully characterize the <u>Control Solutions</u> decision and thus are not false.

48. Neither the May 19 Letter or Press Release falsely implicate or purport to falsely implicate AMVAC.  Rather, the term "other generic manufacturers" was used by the district court, and FMC fairly reported in the May 19 Letter and Press Release that the <u>Control Solutions</u> court "found that" Control Solutions "assisted other generic manufacturers" to label their products with an infringing label.

An appropriate Order follows.

BY THE COURT:

/S/ _____

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

---

49. AMVAC also fails to meet its burden of showing that the May 19 Letter and Press Release have misled any of its customers or are likely to mislead its customers.

. . .

52. The Court does not find evidence that any of the recipients or readers of the May 19 Letter or Press Release were deceived or are likely to be deceived by the May 19 Letter or Press Release.

53. AMVAC has not submitted consumer surveys, declarations, or admissible statements from any recipient of FMC's communications who claims to have been misled or deceived by them.  See Sandoz, 902 F.2d at 229 ("[A] plaintiff must produce consumer surveys or some surrogate therefor to prove whether consumers expect an advertising claim to be substantiated . . .").  If AMVAC's customers had been misled or deceived by the May 19 Letter or Press Release, it is reasonable to expect that at least one of those customers would have so testified.  In the absence of such evidence, the Court has no basis to conclude that any person has been misled or deceived, or is likely to have been misled or deceived, by the May 19 Letter or Press Release.

. . .

75. [The statement that] AMVAC's customers have reduced their supply of generic bifenthrin products is pure speculation and conjecture. AMVAC has not presented any evidence to support its claim that any such reduction in purchasing has taken place.

. . .

79. [. . . ] The evidence is undisputed that since the May 19 Letter and Press Release were issued, FMC has not issued any public statements or sent any correspondence to any third parties concerning the Control Solutions decision or its pending litigation in this Court and in the Eastern District of Pennsylvania.  (Froelich Decl. ¶ 19.)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FMC CORP., | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AMVAC CHEMICAL CORP., | : | |
| Defendant. | : | 05-cv-2593 |

O R D E R

AUGUST 1, 2005

PRATTER, DISTRICT JUDGE

AND NOW, this 1st day of August, 2005, upon consideration of FMC Corporation's

Complaint (Docket No. 1), AMVAC Chemical Corporation's Motion and Brief in Support to

Dismiss or Stay, or, in the Alternative, to Transfer the Pennsylvania Action to the Central District

of California (and its corrected filing) (the "AMVAC Motion") (Docket Nos. 4 and 10), FMC's

Opposition to the AMVAC Motion ("FMC's Response") (Docket No. 12), AMVAC's Reply to

FMC's Response ("AMVAC's Reply"), arguments heard by the Court on June 29, 2005,

AMVAC's Post-Hearing Memorandum in Support (Docket No. 18), FMC's Supplemental

Memorandum in Opposition (Docket No. 20), and consistent with the discussion and reasoning

contained within the attached memorandum of law, IT IS HEREBY ORDERED that AMVAC's

Motion to Dismiss is **DENIED**.  The Court shall retain jurisdiction of the instant matter.

A Scheduling Order with regard to FMC's Motion for Preliminary Injunction will follow
shortly.

IT IS SO ORDERED.

BY THE COURT:

/S/_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE